DECISION
{¶ 1} Relator, SCB, Inc., Lube Plus, filed this original action, which requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying relator's July 11, 2006 motion that the commission exercise its continuing jurisdiction over allowances of the claim of respondent William J. Sheesley *Page 2 
("claimant") and to enter an order disallowing the entire claim on grounds that claimant allegedly failed to disclose pre-existing injuries to his treating physicians.
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny the requested writ. (Attached as Appendix A.) Specifically, the magistrate rejected relator's contention that claimant's statement to an undercover investigator that he sustained a neck injury in the military must be accepted by the commission as medical fact.
 {¶ 3} Relator filed an objection to the magistrate's decision, arguing that the commission abused its discretion by failing to accept claimant's statement to the undercover investigator that he injured his neck in the military as medical fact. This is the same issue raised to and addressed by the magistrate, and relator's arguments are no more persuasive at this juncture. For the reasons set forth in the magistrate's decision, we do not find relator's position well-taken.
 {¶ 4} Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, relator's objection to the magistrate's decision is overruled and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objection overruled; writ of mandamus denied.
 BROWN and FRENCH, JJ., concur. *Page 3 APPENDIX A MAGISTRATE'S DECISION Rendered November 30, 2007 IN MANDAMUS {¶ 5} In this original action, relator, SCB, Inc., Lube Plus, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying relator's July 11, 2006 motion that the commission exercise its continuing jurisdiction over allowances of the claim of respondent William J. Sheesley *Page 4 
("claimant") and to enter an order disallowing the entire claim on grounds that claimant allegedly failed to disclose pre-existing nonindustrial injuries to his treating physicians.
Findings of Fact: {¶ 6} 1. On November 27, 2003, claimant sustained an industrial injury to his cervical area while employed as a mechanic for relator, a state-fund employer. According to a First Report of an Injury, Occupational Disease or Death (FROI-1) completed by claimant, on the date of injury claimant "felt a popping sound in the neck" while lifting and moving a snowplow from a building.
 {¶ 7} 2. The industrial claim was allowed and assigned claim number 03-882030.
 {¶ 8} 3. On January 13, 2004, claimant underwent an MRI of the cervical spine. According to the report of radiologist Harland Meyer, M.D., the MRI disclosed:
 IMPRESSION: Disc herniation most pronounced at the C5-6 level, but also slightly smaller disc/osteophyte complexes at the C6-7 and C7-T1 levels and the C4-5 level as above.
 {¶ 9} 4. On January 28, 2004, claimant visited Joel D. Siegal, M.D., a neurological surgeon. Dr. Siegal wrote:
 Mr. Sheesley is being seen today in follow-up. He was originally seen in the emergency room with significant right upper extremity pain and discomfort. Presently he has significant arm pain, much worse than when he was in the emergency room. He has pain which extends down from the neck into the trapezius region, lateral arm and forearm, with numbness and tingling in the same distribution, including all five fingers. On physical examination, his left biceps is 4/5, triceps 4/5 and grip is slightly weak. His right biceps reflex was 1/2. I reviewed his MRI from St. Elizabeth's Hospital and Nydic, which show right C4-5, C5-6, C6-7 and C7-T1 disc protrusions. It is most severe at C5-6 and C6-7.
 I would recommend a two-level anterior cervical discectomy and fusion with allograft and plate because of the biceps and triceps weakness. We discussed the options, risks and *Page 5 
benefits of non-operative versus operative management and he would like to proceed. I think with the extent of weakness, numbness and discomfort that physical therapy would not be warranted in this situation and that a surgical intervention is recommended earlier rather than later to try and prevent more permanent nerve damage.
 Of note, he denies any other medical problems, including heart, lung, kidneys, chest pain, shortness of breath with activity, and therefore we will forego medical clearance.
 {¶ 10} 5. On February 5, 2004, claimant was examined by treating physician Russell A. Morrison, III, D.O., who reported:
 His original date of injury was 11-27-03. This is a change of physician. He works at Lube Plus out in Canfield at which time he was lifting a snow plow and felt at [sic] pop in his neck on the right side. He initially sought care through a chiropractor, where he was having his neck manipulated. He began having more and more pain in the neck and eventually did have a MRI of his neck done. By that time he was having numbness and tingling and occasional paralysis with different head positions in his right arm. Since then it has progressed where his right arm is almost completely paralyzed. He states that it is very, very weak. He is now having pain in the left shoulder as well. Severe headaches. He eventually went to St. E's on 01-21-04. When he was seen in the ER he was evaluated by a neurosurgeon. He saw Dr. Segal [sic]. He was placed on a Medrol Dose Pack at that time. Vicodin ES for pain. Skelaxin and Celebrex. He did see Dr. Segal [sic] for review of his MRI which revealed herniated disc at C5-6, C6-7 and C7-T1. With his severe weakness in that right arm, he was scheduled for surgery on 02-13-04. This was okayed through workers' compensation with a disclaimer. He is currently here today with complaints as they were above and essentially unchanged. His medications are helping him but only slightly. He is unable to sleep at night secondary to the tingling pain in his right arm. At this time he does need a C84 filled out for time off work and a C9 for post op rehab and a claim amended to include his herniated disc as the claim is only okayed for a cervical sprain and strain now.
 * * * *Page 6 
 Plan is to amend the claim to include the herniation nucleus pulposus at C5-6, C6-7 and C7-T1 with right arm paresis. We will also fill out a C9 for his surgery as well as a C84 for approximately 90 days off as requested by Dr. Segal [sic]. We will follow up with him on a monthly basis after surgery.
 {¶ 11} 6. On February 6, 2004, Dr. Morrison issued an amended report stating:
 Based on my observations of the patient, the results of these findings, the MRI results and Dr. Siegal's report, it is my opinion that these conditions are the direct result of the original injury sustained in this claim and that the claim should be amended to include the following conditions:
 PARALYSIS RIGHT UPPER EXTREMITY
 CERVICAL RADICULOPATHY
 CERVICAL DISC HERNATION AT C5-6, C6-7, C7-T1 AND C4-5
 These conditions are a direct and proximal result of the original injury. I am also basing my opinion on the history of this injury and the patient's denial of any similar conditions and/or injuries.
(Emphasis sic.)
 {¶ 12} 7. On February 11, 2004, treating chiropractor J. Murphy Crum, D.C., reported:
 The above-mentioned patient stated that on 11/27/03 a work-related injury occurred. The patient had been employed at Lube Plus at 4494 Boardman-Canfield Road in Canfield, Ohio, as a mechanic, he had worked there 8 months prior to the injury. According to the patient the accident happened in the following manner: "I was lifting a snow plow with the owner and one other employee to remove it from inside the building to outside the building."
 "I felt a popping sound in the neck and I went home at 6:00 that night and my neck started to get sore and stiff. I applied ice and heat, neck got worse over the weekend." He presented himself in this office on 1/12/03 [sic], at that time he stated that he was experiencing neck pain, which started on the right and spread to the left cervical spine and then between the shoulder blades. He stated he was not sleeping *Page 7 
and his arms were aching on both sides and felt tingly in the fingertips. He also described an aching, throbbing headache in the back of the head, which was eased by Advil.
 * * *
 He states that prior to this accident he has not suffered from any similar physical complaints.
 * * *
 DIAGNOSIS
 Based upon these findings the patient's initial diagnosis was:
 847.0 cervical sprain/strain.
 Over time the patients cervical pain eased somewhat, but his mid-back pain became more intense on 12/8/03 he related being up since 2:30 am with mid-back pain. The patient's diagnosis was updated at that time to include:
 847.0 cervical sprain/strain
 847.1 thoracic sprain/strain.
 The thoracic pain continued with the development of grabbing in the middle back. At that time he related that he felt most of his pain was originating from the middle back. Subsequently an MRI of the thoracic spine was ordered and performed at Medical Imaging Network, which was essentially unremarkable.
 He continued with neck pain and difficulty in maintaining his head in neutral posture without increased pain, an MRI of the cervical spine was performed on 1/13/04. The MRI of the cervical spine had demonstrated "Disc herniation most pronounced at the C5-6 level, but also slightly smaller disc/osteophyte complexes at the C6-7 and C7-T1 levels and the C4-5 level as above. There were also disc problems at C3-4 and C4-5."
 On the morning of 1/23/04 the patient called relating sudden numbness of the right arm with no strength. He described his arm as "limp". I recommended that he go straight to emergency to rule out disc herniation. He attended the St. E's Emergency Clinic where he received a second MRI of the cervical spine and was transported to St. Elizabeth's Hospital Medical Center. At that time he also consulted an *Page 8 
Orthopedic Surgeon, Dr. Siegal who had recommended surgery at two levels. A copy of his report is enclosed. It is my opinion that his diagnosis should be amended to include:
 847.0 cervical sprain/strain
 847.1 thoracic sprain/strain
 722.0 displacement cervical IVD C5-6
 722.4 degeneration of cervical IVD C3-4, C4-5, C6-7 and C7-T1 by way of aggravation
 OPINION
 Upon evaluation of the subjective history, consultation and review of the physical examination and radiographic data as well as the MRI findings, all findings are consistent with the type of accident described by Bill Sheesley, which occurred on 11/27/03.
 * * * Please note the patient had no symptoms in this area prior to his injury. The disc herniations were present subsequent to this injury and prior to the morning of 1/21/04 as confirmed by the cervical MRI of 12/17/03.
(Emphasis sic.)
 {¶ 13} 8. On February 11, 2004, claimant moved for additional allowances in the claim. Claimant moved that the claim be allowed for:
 344.31 Paralysis right upper extremity
 723.4 Cervical Radiculopathy
 722.0 Cervical disc herniation at C5-6, C6-7, C7-T1 and C4-5
 {¶ 14} In support of his motion, claimant cited the January 13, 2004 MRI of the cervical spine, Dr. Siegal's January 28, 2004 report, and Dr. Morrisson's report.
 {¶ 15} 9. On June 21, 2004, at the request of the Ohio Bureau of Workers' Compensation, claimant was examined by orthopedic surgeon Howard A. Pinsky, D.O. Dr. Pinsky reported:
 Mr. Sheesley is a 37-year-old who sustained an injury lifting a snowplow. He was moving it from inside the building to the *Page 9 
outside and felt something pop and developed immediate pain in his neck. He denies any problems with neck or radiating arm pain. Initially, Dr. Crum saw him for chiropractic and conservative treatment. Initial imaging MRI scan 12/17/2003 of the thoracic spine is read as an unremarkable MRI of the thoracic spine. MRI scan of the cervical spine on 01/13/02004 revealed disc herniation pronounced at the C5-C6 level with a smaller disc osteophyte complex at C6-C7 and C7-T1. He had progressive complaints of pain in the neck and right arm that ultimately ended up with acute increasing pain on 01/21/2004 with neck pain with right arm weakness. He was seen at the Boardman Campus Emergency Department and referred for an acute neurosurgical evaluation. The impression on that, it was an acute herniated disc with cervical radiculopathy and myelopathy. He was seen by Joel Siegal, M.D. He was seen by Dr. Siegal initially in the emergency department on January 14, 2004 and office follow-up on January 28, 2004 both consultations were reviewed. Recommendation is made for two level anterior cervical discectomy and fusion because of the ongoing complaints of neck pain and arm weakness.
 On 02/13/2004, a C5-C6 herniated disc, C6-C7 herniated disc, right C6 radiculopathy, right C7 radiculopathy and cervical spondylosis was treated by a C5-C6 anterior cervical discectomy with decompression of spinal cord and bilateral C6 nerve roots. A C6-C7 anterior cervical discectomy with decompression. A C5-C6 arthrodesis with patellar allograft, a C6-C7 arthrodesis with patellar allograft was performed.
 No internal fixation was used. The patient was placed on a postoperative cervical support. He has continued to follow up with Dr. Siegal and postoperative note on March 17, 2004 is available and reviewed. He has continued complaints of neck and right arm pain. X-rays showed a loss of position of his bone graft for cervical fusion. Mr. Sheesley states that he is scheduled on 07/13/2004 for a revision cervical surgery, which will include a repeat fusion at the C5-C6, C6-C7 and C7-T1 levels with internal fixation, iliac crest bone graft and the possibility of application of a halo device. He has not had resolution of his neck and arm pain and weakness of the right arm as a result of the previous procedure and Mr. Sheesley states that he has felt that his ongoing problems would be resolved by the revision procedure. *Page 10 
 He rates his present pain as severe analog scale 9/10 and constant. He has intermittent headaches, complete weakness in the use of the right upper extremity. He takes Vicodin three per day. Reglan ES three per day and Naprosyn and he does not take any additional medication for any other physical conditions.
 * * *
 * * * In my opinion, this worker has not yet reached maximum medical improvement. It is expected that he will require an additional 12 months to recover from his revision cervical surgery, which includes internal fixation with fusion.
 * * * Based on the medical documentation present, the mechanism injury, in my examination I believe the request for additional conditions of 344.31 paralysis right upper extremity, 723.47 for cervical radiculopathy, 722.0 cervical disc herniation at C5-C6, C6-C7, C7-T1 and C4-C5 is medically substantiated as a direct and approximate result of the original injury.
 * * *
 * * * I do not believe he can return to his former position of employment. I have identified my opinion of his physical capacities.
 {¶ 16} 10. On August 30, 2004, at relator's request, claimant was examined by orthopedist Oscar F. Sterle, M.D. In his report dated September 3, 2004, Dr. Sterle opines:
 Allowed Conditions: neck sprain.
 Additional Requested Conditions: cervical radiculopathy, herniated disc, C4-5, C5-6[,] C6-7 and C7-T1, and monoplegia right upper extremity.
 * * *
 The requested conditions should not be additionally allowed on this claim and should be denied for being pre-existing and non-work related. This condition took years to develop and *Page 11 
has not been accelerated or aggravated when considering the mechanism of injury.
 {¶ 17} 11. Following a September 30, 2004 hearing, a district hearing officer ("DHO") issued an order stating:
 It is the order of the District Hearing Officer that the C-86 Motion, filed 02/11/2004, is granted to the extent of this order.
 The District Hearing Officer additionally allows the claim for "PARALYSIS RIGHT UPPER EXTREMITY; CERVICAL RADICULOPATHY; CERVICAL DISC HERNIATION C4-5, C5-6, C6-7, C7-T1."
 In so ruling, the District Hearing Officer relies on the 06/21/2004 report of Dr. Pinsky, as well as, the 01/13/2004 MRI which was performed prior to the 01/21/2004 shower incident and established the presence of the herniated discs.
(Emphasis sic.)
 {¶ 18} 12. Relator administratively appealed the DHO's order of September 30, 2004.
 {¶ 19} 13. Following a November 4, 2004 hearing, a staff hearing officer ("SHO") issued an order stating:
 The order of the District Hearing Officer, from the hearing dated 09/30/2004, is modified to the following extent. Therefore, the Injured Worker's Motion, filed 2/11/2004, is granted to the extent of this order.
 The Hearing Officer orders this claim additionally allowed for the conditions of: "PARALYSIS RIGHT UPPER EXTREMITY, AND CERVICAL DISC HERNIATION AT C4-5, C5-6 AND C6-7 LEVELS" as same have been properly established to be causally related to the injury herein. This part of the decision is based upon the 6/21/2004 report by H. Pinsky, D.O. and a review of the 1/13/2004 MRI study of the cervical spine region. This evidence is found persuasive. *Page 12 
 The Injured Worker's request for recognition of "CERVICAL RADICULOPATHY" is hereby dismissed as same presents no issue for the Industrial Commission to adjudicate as Radiculopathy is merely a symptom and not a separate, compensable medical diagnosis.
(Emphasis sic.)
 {¶ 20} 14. Relator administratively appealed the SHO's order of November 4, 2004.
 {¶ 21} 15. On December 2, 2004, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of November 4, 2004.
 {¶ 22} 16. At relator's request, from March through June 2005, claimant was the subject of surveillance by Myers Research Group of Canfield, Ohio. Myers Research issued a report on August 18, 2005. During the investigation, it was found that claimant was employed at a business established as Total Image Sound located in Boardman, Ohio. On April 27, 2005, an undercover agent, posing as a customer, described the following conversation with claimant:
 * * * Had a lengthy conversation with the subject regarding his military service. The subject is documented telling the investigator how he was in the Army for 17 years, and was discharged due to an injury sustained while on active duty. The subject is documented in detail describing the accident and how it happened. The subject is also documented stating that the injury sustained while on active duty was to his right shoulder and neck. The subject described how his injury affected his right arm and how he was afraid to let military doctors perform the necessary surgery to his neck and shoulder. The subject is documented stating that he has a VA disability rating of 63%. The subject is also documented stating that according to his current doctor, not having the surgery on his shoulder and neck was the best thing that he could have done considering he has not lost any range of motion with his right arm. Terminated handling at 10:00 AM. *Page 13 
 {¶ 23} 17. On July 11, 2005, relator moved the commission to exercise its continuing jurisdiction over the allowance of the claim on grounds that claimant's right to participate was fraudulently obtained. In support of its motion, relator submitted a memorandum with exhibits. Among the exhibits were the Myers Research report and the February 11, 2004 report of Dr. Crum.
 {¶ 24} 18. In its memorandum, relator claimed that the reports from Drs. Morrison, Crum and the "Bureau's Examining Physicians" show that claimant made false statements to those doctors with knowledge of the falsity. According to relator's memorandum, "claimant knew that he had a prior neck and shoulder injury going back to his service in the military and failed to disclose this history to the doctors at hand."
 {¶ 25} 19. Relator's motion was heard by a DHO on August 30, 2006. Apparently, the hearing was not recorded. At the hearing, relator's military records were submitted, presumably by relator. Among those records is a DA form 4707 dated February 2, 1987. The form purports to present findings of evaluating physicians of the United States Army. The document states:
 [One] Brief summary of present illness: 20 year old white male complaining of left shoulder pain and weakness. Pain with push-ups and wear of web gear, associated with crepitus.
 [Two] Brief summary of past medical history: Fell at 18 year[s] of age and sustained left shoulder injury. Told would need screw in shoulder and had arthritis of shoulder.
 [Three] Current clinical and laboratory findings (positive and negative) as required: Left shoulder — tender at acromiom-clavicle joint with crepitus. Decreased range of motion. Left shoulder x-rays — degenerative joint disease at acromiom-clavicle joint, negative widening of coraco-clavicular internal. *Page 14 
 [Four] Diagnosis: Degenerative joint disease of acromiom-clavicle joint, possible due to old fracture soldier does not meet induction standards according to Para 2-9c, and Para 2-11a(4), Chapter 2, AR 40-501[.]
 [Five] Soldier is not recommended for consideration for retention because his medical condition is likely to deteriorate and could result in disability separation in the future.
 {¶ 26} 20. Following the August 30, 2006 hearing, the DHO issued an order denying relator's July 11, 2005 motion for the exercise of continuing jurisdiction over the claim allowances. The DHO's order explains:
 The District Hearing Officer concludes that the employer has failed to establish by a preponderance of the evidence any appropriate ground for the Industrial Commission to invoke its continuing jurisdiction in this matter and revisit the issue of the allowance of this claim and more specifically, to vacate the allowance of this claim in its entirety, as was requested.
 As such, the prior decisions of the BWC and Industrial Commission, shall remain undisturbed and are in full force and legal effect.
 By way of clarification, the District Hearing Officer finds that the employer's request is predicated entirely upon an allegation of fraud.
 More specifically, the employer alleges that the injured worker failed to disclose and purposely concealed part of his medical history, specifically his medical history as it relates to his cervical and left shoulder problems that occurred purportedly while he was in the U.S. Military. The employer contends that the injured worker failed to disclose this information to his physicians, the employer, the BWC and the Industrial Commission, and as such, the employer contends that none of the medical evidence used to establish the allowance and subsequent additional allowances of this claim were valid due to the injured worker's perpetration of a fraud. Further, the employer contends that the injured worker, by purposely concealing his prior medical history of cervical and left shoulder problems, was able to have this *Page 15 
claim allowed when, if the entire medical history had been known, the claim would not have been allowed at all.
 The employer relies upon statements made by the injured worker that are contained on a DVD presentation viewed at this hearing and the injured worker's military medical records records [sic] which are contained within the record.
 However, the District Hearing Officer finds that while those military records reflect a serious left shoulder medical condition, to wit: degenerative joint disease of the left acromioclavicular joint, there is no evidence of any cervical injury or condition contained within those military records.
 As this claim specifically regards a cervical injury and the allowance of cervical conditions only, the District Hearing Officer finds that the injured worker's left shoulder condition is not relevant and in the absence of any documented prior cervical injury, the District Hearing Officer finds the employer's allegation not well taken.
 Based upon the findings above, the Hearing Officer concludes that the employer has failed to establish an appropriate ground for which would warrant the Industrial Commission to invoke its continuing jurisdiction under Section 4123.52 of the Ohio Revised Code.
 Accordingly, the employer's request for the Industrial Commission to invoke its continuing jurisdiction in this matter, is hereby denied.
 {¶ 27} 21. Relator administratively appealed the DHO's order of August 30, 2006.
 {¶ 28} 22. Following a February 28, 2007 hearing, an SHO issued an order affirming the DHO's order of August 30, 2006. The SHO's order explains:
 The Staff Hearing Officer finds that the Employers Motion of 7/12/2006 [sic] seeks invocation of the Industrial Commission's continuing jurisdiction under Ohio Revise[d] Code Section 4123.52. Specifically, the employer alleges that this claim was allowed as the consequence of fraud perpetrated by the claimant on the Bureau of Workers' Compensation and the Industrial Commission of Ohio. Counsel for the employer alleges that claimant failed to truthfully provide a medical history pertaining to any prior injuries which he may *Page 16 
have suffered to his cervical area prior to 11/27/2003. Counsel argues that by providing an inaccurate history of his alleged prior cervical injuries, claimant has secured the allowance of his claim to the detriment of this employer. Counsel for the employer therefore requests that this claim be vacated in its entirety and that all prior compensation and medical benefits paid in this claim be set aside. The Staff Hearing Officer notes that the employer's request for invocation of continuing jurisdiction is based exclusively on an allegation of fraud as described above. In particular, the Staff Hearing Officer finds that the employer alleges that claimant failed to disclose and/or purposefully concealed part of his medical history — a medical history as it relates to his cervical and left shoulder problems — that allegedly occurred while he was in the United States military. The employer contends that by failing to disclose this essential piece of medical history to claimant's physician of record, the employer, the Bureau of Workers' Compensation and the Industrial Commission, claimant perpetrated a fraud on this system and secured the allowance of this claim which would not have been allowed otherwise.
 In adjudicating the employer's motion, the Staff Hearing Officer finds guidance in Memo S2 of the Industrial Commission Policy Statements and Guidelines. Therein, it is specifically provided that when a decision at hearing results in an overpayment due to fraudulent activity, the Hearing Officer shall make a specific finding of fraud in his or her order. More importantly, the policy memo continues by stating that "this finding must be supported by reliable, probative, and substantial evidence".
 The Staff Hearing Officer finds that the employer has failed to establish his requisite burden of proof in showing the presence of fraud on the part of this claimant in the allowance of this claim by reliable, probative, and substantial evidence. In this regard, the Staff Hearing Officer finds that the employer relies upon statements made by the injured worker that are contained in a DVD presentation and the injured worker's military records which are contained within this file.
 However, the Staff Hearing Officer finds that while these military records reflect a serious left shoulder medical condition, specifically, degenerative joint disease of the left acromioclavicular joint, there is an absence of any evidence *Page 17 
of a cervical injury or condition contained within such military records. Here, this claim is allowed for a cervical injury consisting of a "neck sprain; and cervical disc herniation at the C4-5, C5-6, and C6-7 disc levels". The employer has failed to present any medical evidence to establish that claimant had any prior medical history related to his cervical spine before the events of 11/27/2003 — the events upon which this present claim is based. Given the employer's lack of medical evidence to substantiate that claimant did in fact have a cervical condition prior to 11/27/2003 which he failed to disclose, the Staff Hearing Officer is not persuaded that the employer has satisfied his [sic] requisite burden of proof in invoking the Industrial Commission's continuing jurisdiction under Ohio Revised Code Section 4123.52.
 Accordingly, the employer's request for the Industrial Commission to invoke its continuing jurisdiction in this matter so as to review the propriety of the allowance of this claim is denied in its entirety.
 {¶ 29} 23. On March 14, 2007, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of February 28, 2007.
 {¶ 30} 24. On May 14, 2007, relator, SCB, Inc., Lube Plus, filed this mandamus action.
Conclusions of Law: {¶ 31} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 32} The elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (d) with the intent of misleading another into relying upon it; (e) justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the *Page 18 
reliance. Gaines v. PreTerm-Cleveland, Inc. (1987), 33 Ohio St.3d 54,55, citing Burr v. Stark Cty. Bd. of Commrs. (1986), 23 Ohio St.3d 69.
 {¶ 33} A failure to prevail upon any of the necessary elements is fatal to a claim of fraud. Javitch v. First Montauk Financial Corp.
(N.D.Ohio 2003), 279 F.Supp.2d 931, 940, citing Miller v. Knight (1961),115 Ohio App. 485, 487.
 {¶ 34} "[A]n action for fraud and deceit is maintainable not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak." Textron Fin.Corp. v. Nationwide Mut. Ins. Co. (1996), 115 Ohio App.3d 137, 153, quoting Starinki v. Pace (1987), 41 Ohio App.3d 200, 203.
 {¶ 35} The second element of fraud requires that the concealment of a fact be material to the transaction at hand. A fact is material if it is likely, "under the circumstances, to affect the conduct of a reasonable person with reference to the transaction." Leal v. Holtvogt (1998),123 Ohio App.3d 51, 76, quoting Van Camp v. Bradford (1993),63 Ohio Misc.2d 245, 255.
 {¶ 36} In its motion for a finding of fraud, relator claimed that claimant had a duty to disclose to his examining physicians any injury or medical condition that pre-existed the November 27, 2003 industrial injury and that claimant failed to disclose pre-existing injuries or conditions. A duty to disclose to the best of one's ability upon request by the examining physician significant injuries or conditions pre-existing the industrial injury is not seriously at issue in this action.
 {¶ 37} Numerous alleged failures to disclose are cited by relator from the medical records. Relator points out that in Dr. Morrison's office record of March 4, 2004, a "no" *Page 19 
response is given to the query: "Have you ever injured these areas before?" Dr. Crum states in his February 11, 2004 report: "He states that prior to this accident he has not suffered from any similar physical complaints." Dr. Morrison states in his February 6, 2004 amended report: "He denied any previous history of a similar condition." Dr. Morrison concludes: "I am also basing my opinion on the history of this injury and the patient's denial of any similar conditions and/or injuries." Dr. Siegal states in his January 28, 2004 report: "Of note, he denies any other medical problems, including heart, lung, kidneys, chest pain, shortness of breath with activity."
 {¶ 38} Certainly, one can conclude from a reading of the reports of Drs. Morrison, Crum and Siegal that claimant denied any significant pre-existing injuries or conditions to those doctors who examined him and reported for his claim.
 {¶ 39} Relator's key evidence before the commission was an investigative report of claimant's April 27, 2005 conversation with an undercover agent posing as a customer. According to the investigative report, claimant stated that he injured his right shoulder and neck while on active military duty. However, claimant's military medical records do not disclose that claimant ever treated for a neck injury while in the military. Those records only show that claimant sustained aleft shoulder injury when he fell at age 18 and that the left shoulder injury, described as "[degenerative joint disease of acromiom-clavicle joint, possible due to old fracture" was diagnosed and treated while claimant was in the military. The military records were generated in late 1986 and early 1987 and, thus, they pre-date claimant's April 27, 2005 conversation with the investigator by approximately 18 years.
 {¶ 40} In denying relator's motion, the SHO's order of February 28, 2007 explains: *Page 20 
 * * * [W]hile these military records reflect a serious left shoulder medical condition, specifically, degenerative joint disease of the left acromioclavicular joint, there is an absence of any evidence of a cervical injury or condition contained within such military records. Here, this claim is allowed for a cervical injury consisting of a "neck sprain; and cervical disc herniation at the C4-5, C5-6, and C6-7 disc levels". The employer has failed to present any medical evidence to establish that claimant had any prior medical history related to his cervical spine before the events of 11/27/2003 — the events upon which this present claim is based. Given the employer's lack of medical evidence to substantiate that claimant did in fact have a cervical condition prior to 11/27/2003 which he failed to disclose, the Staff Hearing Officer is not persuaded that the employer has satisfied his requisite burden of proof in invoking the Industrial Commission's continuing jurisdiction under Ohio Revised Code Section 4123.52.
 {¶ 41} Two findings are inherent in the SHO's explanation: (1) claimant's failure to disclose his pre-existing left shoulder condition is not material to the transaction and, thus, an essential element of fraud has not been proven; and (2) claimant's April 27, 2005 statement that he sustained a neck injury while in the military is not accepted as proof that claimant had in fact sustained a pre-existing cervical or neck injury.
 {¶ 42} Of course, the first finding identified as inherent to the SHO's explanation is dependent upon the second finding which is the focus of relator's argument here.
 {¶ 43} According to relator, claimant's April 27, 2005 statement regarding a preexisting neck injury must be accepted by the commission as medical fact. Relator attempts to support this proposition by characterizing claimant's statement as an admission against interest.
 {¶ 44} Although relator does not cite Evid.R. 801(D)(2), the magistrate notes that the rule provides that an admission by a party-opponent is not hearsay. The magistrate *Page 21 
also notes that Evid.R. 804(B)(3) provides that a statement against interest is not hearsay if the declarant is unavailable as a witness.
 {¶ 45} The hearsay rule is not at issue here. What is at issue here is relator's assertion that claimant's April 27, 2005 statement regarding a neck injury is an "admission against interest" that the commission must accept as medical fact.
 {¶ 46} Clearly, even evidence that is not rendered inadmissible by the hearsay rule is subject to being weighed by the trier of fact which, in this case, is the commission.
 {¶ 47} Clearly, the commission did not abuse its discretion in determining that claimant's April 27, 2005 statement regarding a pre-existing neck injury was not trustworthy given that the military medical records failed to disclose a cervical or neck injury.
 {¶ 48} We need not speculate here why the military medical evidence does not corroborate claimant's statement, as reported by the investigator, that he sustained an injury to his "right shoulder and neck" while in the military. Clearly, the commission did not abuse its discretion in refusing to accept claimant's statement to the investigator as a medical fact.
 {¶ 49} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 KENNETH W. MACKE MAGISTRATE *Page 1